IN THE UNITED STATES DISTRICT COURT FILED BY ____ D.C.
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION          2005 AUG 31  PM 5: 29

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | | |
|---|---|---|
| MAX MAY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 03-2112 Ml/P |
| | ) | |
| LAWRENCE SCOTT, an individual | ) | |
| resident of Cordova, | ) | |
| Shelby County, Tennessee, | ) | |
| | ) | |
| Defendant. | ) | |

---

## OPINION AND ORDER FOLLOWING NON-JURY TRIAL

---

The Court held a non-jury trial in this case from Monday, November 1, 2004, through Thursday, November 4, 2004. Plaintiffs were represented by John J. Heflin, III., Esq. and Kenneth P. Jones, Esq. Defendant Lawrence Scott was represented by Bobby M. Leatherman, Jr., Esq.[1]

## I.   BACKGROUND AND PROCEDURAL HISTORY

This case arises out of the events whereby Defendant Lawrence Scott obtained ownership of the Memphis Equipment Company ("MEC") following a stock purchase transaction in January

---

[1] On October 27, 2004, the Court issued an Order Approving Resolutions of Board of Directors of Memphis Equipment Company and Administrative Committee of Memphis Equipment Company Employee Stock Ownership Plan Relating to Proposed Settlement and Release of Claims Against Defendant National Bank of Commerce. In addition, on November, 2, 2004, the Court issued an Order Dismissing With Prejudice Plaintiffs' Claims Against Defendant National Bank of Commerce. Accordingly, National Bank of Commerce is no longer a party in this case.

This document entered on the docket sheet in compliance with Rule 58 and/or 79(a) FRCP on  9-2-05



of 1999.[2]  Prior to this transaction, MEC's Employee Stock
Ownership Plan ("MEC ESOP") held all of the company's stock.  Mr.
Scott was the President of MEC, served on its Board of Directors,
and was a member of the Administrative Committee of the MEC ESOP.

Mr. Scott orchestrated his purchase of MEC by entering into
a series of transactions beginning in June of 1998 without the
knowledge or approval of Plaintiffs Max May and Billy Thompson –
the other two members of the Board of Directors of MEC and the
Administrative Committee of the MEC ESOP.  These transactions
included: (1) obtaining a loan from SouthTrust Bank
("SouthTrust") to MEC in the amount of $2,300,000.00; (2)
executing a new Trust Agreement governing administration of the
MEC ESOP that included an added provision absent in the former
Trust Agreement giving the National Bank of Commerce ("NBC"), as
Trustee of the MEC ESOP, the sole discretion to sell company
stock without direction or instruction from the Administrative
Committee; (3) executing the stock purchase transaction in
January of 1999 whereby MEC redeemed all but one share of MEC
stock at a price of $7.78 per share and Mr. Scott purchased the
remaining share of company stock at the same price.

The stock purchase transaction was disclosed in the Annual

---

[2] For a detailed description of the facts underlying this case,
please see the Order Granting in Part and Denying in Part Plaintiffs'
Motion for Partial Summary Judgment, filed on October 21, 2004,
(Docket No. 288), at 2-7.

Report for the MEC ESOP filed with the United States Department
of Labor for the year ending August 31, 1999.  The transaction,
however, was not disclosed in the Summary Annual Report for the
year ending August 31, 1999, or in subsequent summary annual
reports.  The Summary Annual Reports were prepared by Mr. Scott
and the NBC trust department and were given to the MEC ESOP
participants.

Mr. May and Mr. Thompson began to suspect that there was a
sale involving company stock held in the ESOP in either October
or November of 2002.  In response to an inquiry from Mr. Thompson
concerning the status of the company's ownership, Mr. Scott
denied that there was any change in ownership.  Sometime after
Mr. Thompson's inquiry, however, Mr. Scott informed Mr. Thompson
that he had lied and that he had in fact purchased the company.

On February 24, 2003, Plaintiffs brought suit alleging that
Mr. Scott improperly acted without the approval of MEC's Board of
Directors, breached his fiduciary duties as a director and
officer of the company, and wrongfully converted company funds in
violation of Tennessee law.  Plaintiffs also alleged that Mr.
Scott engaged in a prohibited transaction, breached his fiduciary
duties, and failed to properly disclose information regarding the
MEC ESOP in violation of the Employee Retirement Income Security
Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

On October 21, 2004, the Court issued its Order Granting in

3

Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment.[3]  In that order, the Court granted Plaintiffs' Motion for Partial Summary Judgment as to Mr. Scott's liability under §§ 48-22-101(a)(2), 48-18-202(a), 48-18-301 and 48-18-302 of the Tennessee Code for acting without approval of MEC's Board of Directors and breaching his fiduciary duties to the company.  The Court similarly granted summary judgment as to Mr. Scott's liability under ERISA for failure to disclose the January 1999 stock purchase transaction in violation of 29 U.S.C. §§ 1024(b)(3), 1104, and 1109.  Summary judgment was denied, however, as to Mr. Scott's liability for converting MEC funds in violation of Tennessee law.  In addition, summary judgment was denied as to Mr. Scott's liability under ERISA for engaging in a prohibited transaction and failing to disclose the stock purchase transaction in violation of 29 U.S.C. §§ 1106, 1023(b), 1024(b)(1), 1104, and 1109.

On November 1, 2004, the Court issued an Order Rescinding Transaction *Ab Initio*.  Under that order, the Court rescinded, *ab initio*, the following transactions: (1) the $2,300,000.00 loan obtained from SouthTrust; (2) the personal guarantee given by Mr. Scott to SouthTrust to secure the SouthTrust loan;(3) the

---

[3] On the same date, the Court issued an Order Granting Plaintiffs' Motion for Summary Judgment as to Counterclaim of Lawrence Scott (Docket No. 289) and an Order Denying Defendant Scott's Motion for Partial Summary Judgment as Moot. (Docket No. 290.)

execution of the new Trust Agreement governing the administration of the MEC ESOP; (4) the transfer by NBC, as trustee of the MEC ESOP, of all but one share of MEC stock to MEC; (5) the redemption by MEC of all shares transferred to it by NBC; and (6) the transfer by NBC of the remaining share of MEC stock to Mr. Scott for $7.78.

## II.  FINDINGS OF FACT

Based on the proof presented during the non-jury trial held from November 1, 2004, through November 4, 2004, the Court makes the following findings of fact on the issues now before the Court.

MEC buys, rebuilds, and sells military trucks and parts. The company maintains its principal office in Memphis, Tennessee, and has a branch office in Chambersburg, Pennsylvania.  MEC is organized into three departments: (1) the Shop/Service Department, headed by Mr. Thompson; (2) the Parts Department, headed by Mr. May; and (3) the Accounting Department, headed by Mr. Scott.  (Trial Transcript ("Tr.") at 127-29, 209.)

During the bench trial, Plaintiffs demonstrated that Mr. Scott used corporate funds for his personal benefit without the knowledge or approval of MEC's Board of Directors.  Plaintiffs divided their proof concerning Mr. Scott's diversion of corporate assets into the following categories: (1) Mr. Scott's personal account balance as of March of 2003; (2) expenses related to the

January 1999 stock purchase transaction; (3) MEC checks used to pay Mr. Scott's personal expenses; (4) personal charges made by Mr. Scott to the MEC credit card; (5) personal expenses reimbursed to Mr. Scott from petty cash; (6) purchase of a Honda 4-wheeler; (7) purchase of a 1999 Toyota Camry for Mr. Scott's former wife, Ms. Jolynne Scott; (8) payment of health insurance premiums for Mr. Scott's daughter, Ms. Tara Scott; (9) wire transfers made to Mr. Scott's daughters; (10) payment of automobile insurance premiums for the vehicle of Ms. Michelle Scott, Mr. Scott's daughter; and (11) attorney's fees paid to Mr. Scott's counsel in the instant litigation.  The Court will discuss each of these categories in turn.

### A.   Mr. Scott's Personal Account Balance as of March of 2003

Mr. Scott maintained a personal account whereby he made entries on personal ledger cards listing amounts he owed to MEC. (Tr. at 328; Trial Ex. 438.)  These entries were made by either Mr. Scott or Ms. Jolynne Scott.  (Tr. at 330.)  The personal ledger cards reflect that at the beginning of September of 2001, Mr. Scott maintained a balance forward of $5,298.17.  (Tr. at 329; Trial Ex. 438.)  Mr. Scott, however, was unable to produce any record demonstrating the source of the $5,298.17 balance at trial.  (Tr. at 329-30.)  In addition, he was unable to produce personal ledger cards listing amounts he owed to MEC for dates preceding September of 2001.  (Tr. at 329-30, 381-83.)  During

6

the trial, Mr. Scott admitted that the balance from the personal ledger cards was $201,075.07, which represented the amount he owed to the company.  (Tr. at 326-28.)

**B.    Expenses Related to the Stock Purchase Transaction**

At trial, Mr. Scott admitted that he used MEC funds to pay for several expenses related to the January 1999 stock purchase transaction.  These expenses were incurred when Mr. Scott obtained a $2.3 million loan and $500,000.00 line of credit from SouthTrust in order to execute the stock purchase transaction.[4] (Tr. at 343, 355.)  The expenses totaled $63,120.05.[5]  (Trial Exs. 414, 439.)  Although Mr. Scott denied that he owed this amount, he admitted that MEC would not have incurred the above expenses had he not entered into the stock purchase transaction. (Tr. at 355.)

**C.    MEC Checks Used to Pay Mr. Scott's Personal Expenses**

Plaintiffs showed at trial that Mr. Scott paid for $68,426.05 in personal expenses with MEC checks.  (Trial Exs. 414, 439.)  Mr. Scott testified that many of these expenses were either business expenses or were charged to his personal account.

---

[4] Mr. Scott admitted that MEC never drew upon the $500,000.00 line of credit.  (Tr. at 343, 355.)

[5] Plaintiffs originally claimed that the expenses related to the stock purchase transaction totaled $73,120.05.  (Trial Ex. 414.) However, during the trial, Plaintiffs credited Mr. Scott with $10,000.00 in valid expenses and reduced this total to $63,120.05. (Tr. at 350-51; Trial Ex. 439.)

With respect to the charges that Mr. Scott claimed were business expenses, however, he testified that he did not know the business purpose for those expenses.  As to expenses that Mr. Scott claimed appeared on his personal account, Mr. Scott was unable to provide records demonstrating that any such expenses appeared on that account, with the exception of expenses that Plaintiffs credited to Mr. Scott.[6]

The largest expense for which an MEC check was written was in connection with the purchase of a lot in Pennsylvania for Ms. Theresa Robinson, an MEC employee and personal friend of Mr. Scott.  (Tr. at 371; Trial Ex. 414.)  The check was written in the amount of $45,600.00.  (Tr. at 371; Trial Ex. 414.)  Mr. Scott testified that although MEC wrote a check in the above sum, the source of the $45,600.00 was a CD that he cashed in for his mother, which was later deposited into MEC's bank account with the National Bank of Commerce.  (Tr. at 371-72, 525.)  Mr. Scott further testified that these funds were then wire transferred to MEC's account with F&M Trust Bank in Pennsylvania.  (Tr. at 373-74, 525.)  The record shows that $45,600.00 was deposited into MEC's NBC account on March 12, 2001, that on the next day there

---

[6] Plaintiffs originally claimed that Mr. Scott used MEC checks to fund personal expenses in the amount of $84,684.34.  (Trial Ex. 414.) During the trial, however, Plaintiffs credited the following expenses which appeared on Mr. Scott's personal account ledger cards: $7,008.29, $4,000.00, $3,500.00, $1,000.00, and $750.00.  (Trial Ex. 439.)  Plaintiffs' revised claim, therefore, totaled $68,426.05. (Trial Exs. 414, 439.)

8

was an outgoing wire from NBC in the same amount, and that on March 14, 2001, there was an incoming wire of $45,600.00 into MEC's bank account with F&M Trust Bank in Pennsylvania. (Trial Exs. 440, 23.) However, Mr. Scott did not produce a record showing the source of the $45,600.00 deposit into MEC's NBC bank account.[7] (Tr. at 374-75.)

### D. Personal Charges Made by Mr. Scott to MEC Credit Card

MEC had a single corporate credit card that was held by Mr. Scott. (Tr. at 393-94.) The charges made on that account were either made by Mr. Scott or by others with his authorization. (Tr. at 394.) Mr. Scott admitted that MEC always paid the bill for that account. (Tr. at 394-95.) Mr. Scott further testified that the credit card account was addressed to his own personal post office box and that he was the only person who had access to that post office box. (Tr. at 395.)

The testimony offered at trial demonstrated that Mr. Scott charged thousands of dollars worth of personal expenses to the MEC credit card. These charges included expenses on personal items, travel, lodging, and meals. During trial, Plaintiffs divided their presentation regarding Mr. Scott's use of the MEC

---

[7] Mr. Scott also testified that certain other expenses funded with MEC checks and related to Ms. Robinson's home were included in an August 2002 entry on his personal account of $7,769.32. (Tr. at 532-33.) Mr. Scott testified that these expenses were checks written for $5,000.00, $1,000.00, $744.00, and $299.24 and also an unidentified amount of $1,470.08. (Id.) Mr. Scott did not provide evidence concerning the source of the $1,470.08 figure. (Id.)

9

credit card into three categories: (1) personal charges made by Mr. Scott excluding travel charges; (2) personal travel charges; and (3) charges for personal meals. The Court will discuss its findings regarding these three categories in turn.

### 1. Personal Charges Made by Mr. Scott Excluding Travel Charges

Plaintiffs demonstrated that Mr. Scott charged $162,883.71 in personal expenses, excluding travel and personal meal charges, to MEC's corporate credit card between December of 1997 and December of 2002.[8]  (See Trial Exs. 414, 439.)  Of this amount, Mr. Scott testified that $68,137.99 related to business expenses. (See Trial Exs. 414, 439.)  During the trial, when Mr. Scott was questioned about these charges, he was unable to recall whether they were, in fact, business expenses. (Tr. at 414-66.)  Even when he stated a business purpose for a specific expense, Mr. Scott did not provide any records, such as an MEC expense reimbursement form, to demonstrate that the expenses were related to MEC business.[9]  Mr. Scott admitted during trial that the

---

[8] Plaintiffs originally alleged that Mr. Scott charged personal expenses totaling $166,474.70 to the company credit card.  (Trial Ex. 414.)  During trial, however, Plaintiffs credited expenses totaling $3,590.99 to the original total to arrive at a revised total of $162,883.71.  (Trial Exs. 414, 439.)

[9] Some of the largest charges to the company credit card that Mr. Scott claimed were business expenses concerned charges from the University of Memphis Athletic Department.  The parties stipulated that the contributions and other expenses associated with the University of Memphis Athletic Department were all made in the name of Mr. Scott.  (Tr. at 122.)  Mr. Scott admitted that none of the charges
(... continued)

remaining charges of $94,745.72 were for personal expenses. Although Mr. Scott testified that he repaid some of the credit card charges for personal expenses in cash, he did not provide any records showing reimbursement. (Tr. at 466-67.)

## 2.  Personal Travel Charges

The majority of travel expenses charged to the MEC credit card involved Mr. Scott's travel to Pennsylvania. Mr. Scott testified that he was required to travel frequently to Pennsylvania to fix a computer problem involving the transfer of data between MEC's Chambersburg and Memphis offices. (Tr. at 473-74.) No other witness, however, supported Mr. Scott's testimony concerning his need to travel frequently to Pennsylvania to fix such a problem. Mr. Glenn Alleman, the branch manager of the MEC Chambersburg office, testified that since 1995, he had only seen Mr. Scott come to the Chambersburg office to work approximately five times. (Tr. at 182.) Mr.

---

(... continued)
from the University of Memphis Athletic Department were approved by the MEC Board of Directors and that MEC did not derive any benefit from the contributions made to the University of Memphis Athletic Department. (Tr. at 415-17.) Rather, Mr. Scott testified that he felt he owed it to the University to make those contributions. (Tr. at 416.)

In addition, Mr. Scott testified during trial that he made contributions to the Capitol Theatre in Chambersburg, Pennsylvania, and WKNO TV FM and the Orpheum Theatre in Memphis, Tennessee. Mr. Scott, however, was unable to recall whether those contributions were made in MEC's name and admitted that he made them without the knowledge or approval of the MEC Board of Directors. (Tr. at 446-47, 449, 454-55.)

Alleman, Mr. Thompson, and Mr. May all testified that they knew of no business reason that would have required Mr. Scott to make frequent trips to Pennsylvania over the weekends. (Tr. at 146, 188-89, 221.)

Mr. Scott testified that he had a close friendship with an employee at the Chambersburg office, Ms. Theresa Robinson. (Tr. at 474-75.) Although Mr. Scott denied he usually stayed with Ms. Robinson when traveling to Chambersburg, he testified that he used company funds to assist the construction and furnishing of her home and stayed with her in that home on many occasions once it was constructed. (Tr. at 474-75.) Mr. Scott also admitted that, with respect to almost all of his trips to Pennsylvania, he did not complete an MEC expense reimbursement form used by employees seeking reimbursement for business expenses, including travel. (Tr. at 475-76.)

Mr. Scott also testified that travel charges unrelated to his Pennsylvania travel were legitimate business expenses.[10] With the exception of business expenses credited by Plaintiffs during trial, however, Mr. Scott was unable to provide evidence of a business purpose for his travel expenses outside of Pennsylvania. Plaintiffs demonstrated during trial that Mr.

---

[10] Mr. Scott also disputed that a charge involving a stay at the Four Seasons Hotel in Philadelphia, Pennsylvania, on March 20, 2000, was a purely personal charge. (Tr. at 483-84.) Mr. Scott testified that there was a business component to that trip because he met with an attorney, but he provided no evidence to support this assertion. (Id.)

Scott charged $70,252.19 to the MEC credit card for personal travel expenses.[11]

### 3.   Charges for Personal Meals

Mr. Scott charged many personal meals to the MEC credit card.  These charges totaled $8,543.14.  (Trial Ex. 414.) Although Mr. Scott testified that many of these meals were legitimate business expenses because they were charged pursuant to an MEC policy permitting employees to charge meals to the company if they worked after either 6 or 7 p.m., his assertions were contradicted by evidence presented at trial.[12]  (Tr. at 492-02.)

### E.   Personal Expenses Reimbursed to Mr. Scott from Petty Cash

Plaintiffs demonstrated that Mr. Scott reimbursed himself $1,844.78 for personal expenses out of MEC's petty cash.  (Trial Ex. 414.)  Although Mr. Scott testified that reimbursements from

---

[11] Plaintiffs originally alleged that Mr. Scott charged personal expenses totaling $70,818.76 to the company credit card.  (Trial Ex. 414.)  During trial, however, Plaintiffs credited $566.57 from the original total to arrive at a revised total of $70,252.19.  (Trial Exs. 414, 439.)

[12] Mr. Scott testified that $46,758.94 of the total amount he admitted were personal expenses charged to MEC's credit card represents a portion of an August 2002 entry of $56,215.31 in his personal ledger cards and therefore was an amount already included in his personal account.  (Tr. at 522-25.)  However, in making the above calculation, Mr. Scott included charges that he claimed were business, rather than personal expenses and included credit card charges from September through December of 2002.  (Tr. at 563-67; Tr. Ex. 441.)  Mr. Scott further testified that the August 2002 personal ledger account entry was made in August of 2002.  (Tr. at 566-67.)

petty cash for personal meals were made pursuant to the working late policy described above, his assertion was contradicted by the evidence presented at trial. With respect to the remainder of the expenses reimbursed from petty cash, Mr. Scott did not provide any evidence showing the business purpose for those expenses.

**F.   Purchase of Honda 4-wheeler**

On December 18, 1997, Mr. Scott purchased a 1998 Honda TRX300FWW 4-wheeler with company funds for $5,981.40. (Tr. at 287; Trial Ex. 87.) This vehicle was purchased for Mr. Scott's own personal use and was delivered to Mr. Scott at his mother's home. (Tr. at 287, 290.) Although Mr. Scott testified that he believed he had reimbursed the company for this expense, he admitted that he possesses no records demonstrating any such reimbursement. (Tr. at 287-90.)

**G.   Purchase of 1999 Toyota Camry for Ms. Jolynne Scott**

On August 18, 1999, Mr. Scott purchased a 1999 Toyota Camry for his former wife, Ms. Jolynne Scott, with company funds for $18,342.00. (Tr. at 103-04, 290-92; Trial Ex. 13.) Mr. Scott admitted that he had the vehicle titled in Ms. Scott's name, that the vehicle was never reported as income to Ms. Scott, and that Ms. Scott never personally paid for the vehicle. (Tr. at 291.) Ms. Scott testified that she has never paid tax in connection with the vehicle and never reimbursed MEC for the purchase. (Tr.

14

at 104, 106.)

Mr. Thompson testified that although he became aware that the Camry was purchased with company funds, Mr. Scott informed him that the vehicle was purchased through the company to save certain dock fees and that Ms. Scott had arranged for financing with a bank. (Tr. at 145.)  Mr. Thompson further testified that Mr. Scott indicated that Ms. Scott was paying for the vehicle. (Id.)  Mr. May testified that he was also aware of the purchase, as he saw a copy of the vehicle invoice that was faxed to the company from the dealership.  (Tr. at 219.)  After Mr. May showed Mr. Scott the invoice, Mr. Scott similarly informed him that the company purchased the vehicle to save Ms. Scott money and that he was making arrangements with her to obtain a loan.  In addition, Mr. May testified that Mr. Scott indicated that Ms. Scott would pay for the vehicle.[13]  (Tr. at 220.)

### H.   Payment of Health Insurance Premiums for Ms. Tara Scott

Mr. Scott admitted that his daughter, Ms. Tara Scott, was covered by the company's health insurance between February of 2001 and November of 2002.  (Tr. at 294-96.)  Ms. Scott was not an employee of the company.  (Tr. at 296.)  Between February of

---

[13] Mr. May further testified that after this conversation with Mr. Scott, he ran the number appearing on the license plate of the Camry to make sure that the vehicle was registered to Ms. Scott.  (Tr. at 220.)  After learning that the vehicle was registered to Ms. Scott, Mr. May did not conduct any further investigation.  (Tr. at 221.)  Mr. May testified that after he saw that the vehicle was registered to Ms. Scott, he "thought she had got a loan and the car was in her name and everything was kosher."  (Id.)

15

2001 and February of 2002, the cost of Ms. Scott's premium was $201.44 per month.  (Tr. at 295-97.)  From February of 2002 until November of 2002, the cost of the premium rose to $226.53 per month.  (Id.)  Mr. Scott admitted that the company made the premium payments on Ms. Scott's health insurance for all but one month during her period of coverage, that he never reimbursed the company for those payments, and that he accordingly owed the company $4,456.05 for those payments.[14]  (Tr. at 296-99; Trial Exs. 414, 439.)

## I.   Wire Transfers Made to Mr. Scott's Daughters

Mr. Scott admitted at trial that he made wire transfers of corporate funds to his daughters generally in the amount of $500.00.  (Tr. at 299-300.)  Mr. Scott was unable to recall how many wire transfers he made to his daughters, but he testified that they were not made every month.  (Tr. at 300.)  Although Mr. Scott testified that he believed that all of the $500 wire transfers were from his personal account, he admitted he had no records to support this assertion.  (Tr. at 301.)

## J.   Automobile Insurance Premiums for Ms. Michelle Scott's Vehicle.

---

[14] Plaintiffs originally alleged that Mr. Scott owed $4,682.58 for the premium payments made by the company.  (Trial Ex. 414.)  At trial, however, Mr. Scott testified that he made a premium payment in November of 2002 for $226.53.  (Tr. at 298-99.)  Plaintiffs accordingly credited this payment and deducted $226.53 from the $4,682.58 originally claimed for a revised total of $4,456.05.  (Tr. at 299; Trial Exs. 414, 439.)

16

Mr. Scott admitted that a Mazda Protege automobile belonging to his daughter, Ms. Michelle Scott, was covered by the company's automobile insurance for a period of three years.  (Tr. at 323-24.)  MEC's automobile insurance records did not, however, display the cost of coverage on Ms. Scott's Mazda Protege for this period.  (Tr. at 301-02, 324.)  Mr. Scott admitted that he has not produced any record demonstrating that MEC was reimbursed for any cost associated with the coverage on Ms. Scott's vehicle. (Tr. at 324-25.)

### K.   Attorney's Fees From the Instant Litigation Paid to Mr. Scott's Attorney

The parties stipulated, and Mr. Scott also admitted during trial, that he used MEC funds to pay his attorney's fees incurred in the instant litigation.  (Tr. at 303-04, 325).  The amount of attorney's fees totaled $21,500.00.  (Tr. at 303-04; Trial Ex. 414.)  Mr. Scott testified that those fees did not appear on his personal account, that he believed he was entitled to pay those fees, and that he did not reimburse those fees to the company. (Tr. at 325.)

## III. ANALYSIS

Plaintiffs contend that Mr. Scott is liable for the wrongful conversion of MEC funds for his own personal use.[15]  Plaintiffs

---

[15] Alternatively, Plaintiffs contend that Mr. Scott is liable for unjust enrichment and restitution as a result of his conduct in the instant case.

also assert that Mr. Scott is personally liable under ERISA to restore to the MEC ESOP any losses stemming from his breach of fiduciary duty as well as any profits he made though his use of ESOP assets. Also pursuant to ERISA, Plaintiffs seek equitable or remedial relief against Mr. Scott due to his breach of fiduciary duty. Specifically, Plaintiffs request that Mr. Scott's interest in the MEC ESOP be forfeited and that the Court enter certain injunctive relief. In addition, Plaintiffs contend that they are entitled to attorney's fees and costs under Tennessee law and/or ERISA. The Court will consider Plaintiffs' contentions in turn.

## A.  Conversion

Plaintiffs brought their conversion claim as a shareholder derivative action.[16] As an initial matter, the Court addresses Mr. Scott's contention that Plaintiffs are time-barred from asserting their conversion claim. In particular, Mr. Scott contends that Plaintiffs knew or should have known about the stock purchase transaction, the charges made to the company

---

[16] Mr. Scott contends that the non-director Plaintiffs are precluded from bringing a shareholder derivative action because they lack standing. In particular, he contends that the non-director Plaintiffs did not make a demand upon Mr. May and Mr. Thompson, both of whom were members of the Board of Directors. The Court, however, finds this argument unpersuasive because any such demand would have been futile. See Lewis ex rel. Citizens Savings Bank & Trust Co. v. Boyd, 838 S.W.2d 215, 221 (Tenn. Ct. App. 1992) (stating Tennessee courts have excused demand requirement if making such demand "would be an 'idle ceremony' ... and when the corporation's officers and directors will themselves be defendants").

credit card, and the charges associated with the purchase of the 1999 Toyota Camry for Ms. Jolynne Scott more than one year before they filed this lawsuit.[17]  The Court finds this argument unpersuasive, however, given Mr. Scott's fraudulent concealment[18] of the above transactions.[19]  See Pero's Steak and Spaghetti House v. Lee, 90 S.W.3d 614, 625 (Tenn. 2002).

"A conversion ... is the appropriation of [a] thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right."  Barger v. Webb, 391 S.W.2d 664, 665 (Tenn. 1965).  In order to be liable for conversion, a defendant "need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the

---

[17] The statute of limitations for wrongful conversion, however, is three years.  See Tenn. Code Ann. §§ 28-3-105, 47-3-118(g).

[18] The elements of an actionable fraudulent concealment claim are:

> (1) that the defendant took affirmative action to conceal the cause of action or remained silent and failed to disclose material facts despite a duty to do so; (2) that the plaintiff could not have discovered the cause of action despite exercising reasonable care and diligence; (3) that the defendant had knowledge of the facts giving rise to the cause of action; and (4) that the defendant concealed material facts from the plaintiff by withholding information or making use of some device to mislead the plaintiff, or by failing to disclose information when he or she had a duty to do so.

Pero's Steak and Spaghetti House v. Lee, 90 S.W.3d 614, 625 (Tenn. 2002) (citing Shadrick v. Coker, 963 S.W.2d 726, 735-36 (Tenn.1998)).

[19] Mr. Scott also claims that Plaintiffs have unclean hands and are thus precluded from asserting their conversion claim.  The Court, however, finds that the evidence presented at trial and the record in this case do not support Mr. Scott's contention.

19

plaintiff's rights, and do so; good faith is generally immaterial." <u>Mammoth Cave Production Credit Ass'n v. Oldham</u>, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977).

Courts closely scrutinize a corporation's transactions with an officer or director, and the burden of proving that such transactions were entered into in good faith is placed upon that officer or director.[20] <u>Intertherm, Inc. v. Olympic Home Sys., Inc.</u>, 569 S.W.2d 467, 471 (Tenn Ct. App. 1978). The burden of proof is so allocated due to the director or officer's position as a fiduciary. <u>Id.</u> ("As a fiduciary, the officer or director has a strong influence on how the corporation conducts its affairs, and a correspondingly strong duty not to conduct those affairs to the unfair detriment of others ... who also have legitimate interests in the corporation but lack the power of the fiduciary.").

The proof offered at trial demonstrated that Mr. Scott repeatedly converted MEC assets to fund his personal expenses without the knowledge or approval of MEC's Board of Directors. Mr. Scott wrote company checks, charged the company credit card, and reimbursed himself from the company's petty cash to fund personal expenses for himself, members of his family, and Ms. Theresa Robinson. In particular, Mr. Scott caused the company to fund expenses associated with: the preparation and execution of

---

[20] <u>See</u> <u>infra</u> fn. 26.

the January 1999 stock purchase transaction[21]; a Honda 4-wheeler;
a 1999 Toyota Camry for his former wife, Ms. Jolynne Scott;
health insurance coverage for his daughter, Ms. Tara Scott;
automobile insurance coverage for a vehicle belonging to his
daughter, Ms. Michelle Scott; wire transfers made to both of his
daughters; and fees paid to his attorney in the instant
litigation.

Although Mr. Scott claimed that many expenses he caused MEC
to incur were legitimate business expenses,[22] with the exception

---

[21] Mr. Scott contends that he should not be liable to the company
for the charges associated with the stock purchase transaction because
Plaintiffs have benefitted from the recission of that transaction.
Specifically, he argues that, as a result of the recission, the
company will retain $400,000.00, since it will receive $2.3 million
from the Trustee and will then pay back the $1.9 million balance
remaining on the loan it obtained from SouthTrust. According to Mr.
Scott, this $400,000.00 amount should offset the transaction costs he
caused the company to incur. However, the $400,000.00 is not a
benefit retained by MEC. Instead, that amount, along with the $1.9
million loan balance, equals the amount of the original $2.3 million
loan Mr. Scott caused MEC to obtain from SouthTrust to facilitate the
stock purchase transaction. Accordingly, the Court finds Mr. Scott's
contention unpersuasive.

[22] Mr. Scott specifically contends that credit card charges for
contributions to the University of Memphis Athletic Department and
other entities such as the Orpheum Theatre were legitimate business
expenses. With respect to the contributions to the University of
Memphis Athletic Department, all such contributions were made in Mr.
Scott's name, none of the charges for those contributions was approved
by the company's Board of Directors, and the company derived no
benefit from the contributions. (See supra section II.D.1, n.9.)
Instead, Mr. Scott testified that he believed he owed it to the
university to make such contributions. (Id.) As to other
contributions made to entities such as the Orpheum Theatre, Mr. Scott
could not recall whether those contributions were made in MEC's name
and admitted that they were made without the knowledge or approval of
the company's Board of Directors. Accordingly, the Court finds Mr.
Scott's contention unpersuasive.
    The Court similarly finds unpersuasive Mr. Scott's contention
                                                    (continued...)

of amounts Plaintiffs credited during the trial, he was unable to

prove the business purpose of those expenses.[23]  Mr. Scott also

claimed that many other expenses incurred by the company either

appeared on his personal account[24] or were repaid to the company

in cash.[25]  However, apart from the amounts Plaintiffs credited

---

(continued...)
that his travel expenses to Pennsylvania were legitimate business
expenses related to addressing a computer problem involving the
transfer of data between MEC's Chambersburg and Memphis offices.  No
other witness during trial offered testimony lending support to Mr.
Scott's contention.  (See supra Section II D 2.)  Moreover, Mr. Glenn
Alleman, the branch manager of the MEC Chambersburg office, only saw
Mr. Scott come to the Chambersburg office and work approximately five
times since 1995.  Mr. Alleman, Mr. Thompson, and Mr. May testified
that they knew of no business reason requiring Mr. Scott to make
frequent trips to Pennsylvania over the weekends.  (Id.)  In addition,
Mr. Scott had a close friendship with Ms. Theresa Robinson, an
employee at the Chambersburg office, used company funds to help
construct and furnish her home, and stayed with her in that home on
many occasions after it was built.  (Id.)

[23] In particular, Mr. Scott was unable to either recall a specific
expense's business purpose or provide records demonstrating that an
expense was business-related.

[24] For instance, Mr. Scott contends that $46,758.94 of the total
amount he admits were personal expenses charged to MEC's credit card
represents a portion of an August 2002 entry of $56,215.31 in his
personal ledger cards.  Therefore, he argues that amount is already
included in his personal account and should not be charged to him.
This argument is without merit, however, as the Court previously noted
that in making the above calculation, Mr. Scott included charges he
claimed were business, rather than personal expenses and included
credit card charges from September through December of 2002.  (See
supra Section II.D.3, n.12.)
    The Court similarly finds unpersuasive Mr. Scott's argument that
expenses funded with MEC checks and relating to Ms. Robinson's home
were included in an August 2002 entry on his personal account of
$7,769.32, as Mr. Scott could not provide the source of a $1,470.08
figure he contended comprised the $7,769.32 entry in his personal
account.  (See supra Section II.C., n.7.)

[25] Mr. Scott also contends that although an MEC check was written
for $45,600.00 to purchase land in Pennsylvania for Ms. Theresa
(continued...)

at trial, Mr. Scott did not produce any records supporting his testimony.

Having found that Mr. Scott is liable for unlawful conversion, the Court next determines the amount of damages to award Plaintiffs. Plaintiffs first seek to recover the amount of funds that Mr. Scott diverted from MEC for his own personal use. Mr. Scott admitted during trial that he owed MEC $201,075.07, the balance reflected on his personal account. In addition, Plaintiffs proved that Mr. Scott diverted the following MEC funds for his own personal use: (1) $63,120.05 in preparing and executing the January 1999 stock purchase transaction; (2) $68,426.05 by writing numerous MEC checks; (3) $241,679.04 by charging the company credit card; (4) $1,844.78 by reimbursing himself from the company's petty cash; (5) $5,981.40 by purchasing a Honda 4-wheeler; (6) $18,342.00 by purchasing a 1999 Toyota Camry for his former wife, Ms. Jolynne Scott; and (7) $4,456.05 by placing his daughter, Ms. Tara Scott, on the company's health insurance. As discussed above, apart from the amounts Plaintiffs credited during the trial, Mr. Scott did not

---

(continued...)
Robinson, the source of the $45,600.00 was a CD that he cashed in for his mother, which was later deposited into MEC's bank account with the National Bank of Commerce, and therefore that amount should not be charged against him. As the Court noted previously, however, Mr. Scott did not produce a record showing the source of the $45,600.00 deposit into MEC's NBC bank account. (See supra Section II.C.) Accordingly, the Court finds this contention unpersuasive.

demonstrate that he had a legitimate business purpose, made entries on his personal account, or otherwise reimbursed MEC for these expenditures.[26]  Therefore, the Court finds that Plaintiffs are entitled to recover from Mr. Scott $604,924.44, the sum of the above amounts.

Mr. Scott also admitted that he used company funds to insure his daughter's Mazda Protege on the company's automobile insurance policy for three years and that he has not reimbursed the company for such coverage.  MEC's records concerning its automobile insurance did not reflect the cost of covering Ms. Scott's vehicle during the three-year period.  Plaintiffs contend that $1,000.00 is a conservative estimate of the cost for Ms. Scott's automobile insurance premium.  The Court agrees, and therefore finds that Plaintiffs are entitled to recover $1,000.00 for the costs of such coverage.

Mr. Scott admitted that he wired company funds—typically in the amount of $500—to both of his daughters.  However, Mr. Scott could not recall the number of wire transfers he made.  In addition, although Mr. Scott testified that he believed that all of the $500 wire transfers were on his personal account, he admitted he had no records to support his testimony.  Because Mr.

---

[26] Even if the burden of proof regarding Defendant's lack of good faith when engaging in corporate transactions rested squarely on Plaintiffs, they have more than satisfied that burden in this case. The credible evidence supporting Plaintiffs' claims is overwhelming; moreover, much of the critical evidence in the case was either admitted by Mr. Scott or not controverted by any credible evidence.

Scott admitted that he made at least one wire transfer of $500.00, the Court finds that Plaintiffs are entitled to recover $500.00 for the transfer of company funds.

In addition, the parties stipulated and Mr. Scott admitted that he used MEC funds to pay $21,500.00 in fees to his attorney in the instant litigation. Although Mr. Scott admits that he has not reimbursed the company for those fees, he contends that as the sole shareholder and President of the company, he and MEC had an interest in defending the instant lawsuit. The instant lawsuit, however, would not have occurred but for Mr. Scott's breaches of fiduciary duty in orchestrating the January 1999 stock purchase transaction. Accordingly, the Court finds that Plaintiffs are entitled to recover the $21,500.00 in fees Mr. Scott paid to his attorney during the instant litigation.

As set forth above, the Court finds that Mr. Scott is liable for wrongfully converting MEC funds for his own personal use.[27] The Court also finds that Plaintiffs are entitled to $627,924.44 in damages as a result of Mr. Scott's unlawful conversion. The following table lists the individual amounts that comprise the $627,924.44 award:

---

[27] Accordingly, the Court need not address Plaintiffs' claims for unjust enrichment and restitution.

| Category of Expense | Amount of Diverted MEC Funds |
|---|---|
| Personal Account Balance | $201,075.07 |
| January 1999 Stock Purchase Transaction Expenses | $63,120.05 |
| MEC Checks | $68,426.05 |
| MEC Credit Card Charges | $241,679.04 |
| MEC Petty Cash Reimbursements | $1,844.78 |
| Purchase of Honda 4-Wheeler | $5,981.40 |
| Purchase of 1999 Toyota Camry for Ms. Jolynne Scott | $18,342.00 |
| Health Insurance Coverage for Ms. Tara Scott | $4,456.05 |
| Automobile Insurance Coverage for Ms. Michelle Scott | $1,000.00 |
| Wire Transfers to Daughters | $500.00 |
| Attorney's Fees Paid Defending Instant Litigation | $21,500.00 |
| **TOTAL** | $627,924.44 |

### B.   ERISA

In the October 21, 2004, Order Granting in Part and Denying in Part Plaintiffs' Motion for Partial Summary Judgment, the Court found that Mr. Scott was liable under 29 U.S.C. §§ 1024(b)(3), 1104, and 1109 for failing to disclose the January 1999 stock purchase transaction to the MEC ESOP participants in derogation of his fiduciary duties.  In particular, the Court found that the Summary Annual Reports provided to MEC ESOP participants for the fiscal year ending August 31, 1999, as well as subsequent Reports, did not disclose the stock purchase

transaction.   Plaintiffs therefore contend that pursuant to 29 U.S.C. § 1109, Mr. Scott is personally liable for any losses to the ESOP resulting from his breach of fiduciary duty and any profits he made through his use of ESOP assets.   See 29 U.S.C. § 1109(a).[28]  Plaintiffs also contend that pursuant to § 1109, Mr. Scott is subject to "such other equitable or remedial relief as the court may deem appropriate."   Id.  The Court will address these contentions in turn.

> **1.   Mr. Scott's Personal Liability Under 29 U.S.C. § 1109 as a Result of His Failure to Disclose the January 1999 Stock Purchase Transaction**

Plaintiffs specifically contend that, had Mr. Scott promptly disclosed the January 1999 stock purchase transaction, the instant lawsuit would have been commenced earlier and Mr. Scott would have had less time to divert MEC funds.   Plaintiffs further contend that MEC itself was the most valuable asset of the ESOP

---

[28] Section 1109(a) provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

29 U.S.C. § 1109(a).

and that by diverting company funds, Mr. Scott caused the company, and correspondingly the ESOP, to lose value. Therefore, Plaintiffs assert that they are entitled to restitution of all funds Mr. Scott diverted from MEC beginning from and following the January 1999 stock purchase transaction.

The Court agrees that Mr. Scott caused losses to the MEC ESOP through his diversion of company funds following the January 1999 stock purchase transaction and therefore finds that Plaintiffs are entitled to restitution.[29]  The Court must, however, determine the specific date upon which such losses to the MEC ESOP began to accrue.  Under 29 U.S.C. § 1024(b)(3), Mr. Scott was required to disclose the January 1999 stock purchase transaction to each plan participant and each beneficiary receiving benefits under the plan "within 210 days after the close of the fiscal year of the plan."  29 U.S.C. § 1024(b)(3).[30]

---

[29] The Court accordingly finds Mr. Scott's contentions that the ESOP suffered no loss after the stock purchase transaction and that it actually benefitted from the transaction unpersuasive.

[30] Section 1024(b)(3) specifically provides:

> Within 210 days after the close of the fiscal year of the plan, the administrator shall furnish to each participant, and to each beneficiary receiving benefits under the plan, a copy of the statements and schedules, for such fiscal year, described in subparagraphs (A) and (B) of section 1023(b)(3) of this title and such other material (including the percentage determined under section 1023(d)(11) of this title) as is necessary to fairly summarize the latest annual report.

29 U.S.C. § 1024(b)(3).

28

Because the fiscal year for the ESOP ended on August 31, 1999, Mr. Scott was required to disclose the stock purchase transaction by March 29, 2000.  Thus, any diversions of company funds occurring on or after March 29, 2000, constitute the losses to the ESOP resulting from Mr. Scott's failure to disclose.

The Court has already awarded Plaintiffs damages in the amount of $627,924.44 for Mr. Scott's wrongful conversion.  This award includes the loss incurred by the ESOP as a result of Mr. Scott's failure to disclose the January 1999 stock purchase transaction.  Of the $627,924.44 damages award, the Court has determined that $455,720.78[31] constitutes losses to the ESOP resulting from Mr. Scott's failure to disclose.  Pursuant to 29 U.S.C. § 1109, Mr. Scott is therefore personally liable to pay $455,720.78 directly to the MEC ESOP.

### 2.   Equitable or Remedial Relief Available to Plaintiffs Pursuant to 29 U.S.C. § 1109 as a Result of Mr. Scott's Failure to Disclose

Plaintiffs also argue that they are entitled to equitable or remedial relief pursuant to 29 U.S.C. § 1109.  In particular, Plaintiffs request that the Court order Mr. Scott to forfeit his

---

[31] This amount is comprised of the following expenses incurred either on or after March 29, 2000: (1) personal account balance of amount owed to MEC; (2) personal credit card charges; (3) reimbursements from petty cash; (4) MEC checks; (5) health insurance coverage for Ms. Tara Scott; (6) automobile insurance coverage for vehicle of Ms. Michelle Scott; and (7) attorney's fees paid during the instant litigation.

interest in the MEC ESOP[32] and that the Court grant certain
injunctive relief.  The Court will address these contentions in
turn.

### a.   Forfeiture of Mr. Scott's Interest in the MEC ESOP

Mr. Scott testified at trial that he currently does not have
the ability to satisfy any judgment for liability with his
personal assets.  (Tr. at 334-35.)  Accordingly, Plaintiffs
contend that Mr. Scott should be required to forfeit his interest
in the MEC ESOP.  Plaintiffs rely on Gaudet v. Sheet Metal
Workers' Nat'l Pension Fund, 216 F.Supp.2d 582 (E.D. La. 2002) to
support their contention.  In Gaudet, the district court held
that a union administered pension fund was not obligated to pay a
member of the union's executive board funds to which he was
otherwise entitled, because any such duty was extinguished when
that member embezzled funds from the pension plan in an amount
that exceeded what he would have been owed under the plan.  216
F.Supp.2d at 590; see also Parker v. Bain, 68 F.3d 1131, 1141
(9th Cir. 1995) (stating district court properly concluded that
fiduciary's interest in pension plan extinguished when damages
owed to plan due to his embezzlement of plan funds exceeded
amount plan owed him).  In addition, the district court in Gaudet
found that there was no offset to be made against the member of

---

[32] Alternatively, Plaintiffs request that the Court impose a
constructive trust upon Mr. Scott's MEC ESOP account.

the executive board in favor of the pension fund because the member already received funds that he would have otherwise been owed under the plan. Id. Therefore, the district court concluded that ERISA's anti-alienation provision contained in 29 U.S.C. § 1056(d)[33], as well as its corresponding exception allowing a court to offset a plan participant's benefits, were inapplicable.[34]

The Court finds the reasoning of the district court in Gaudet persuasive and applicable to the facts of the instant case. Mr. Scott has already been found by the Court to have caused losses to the MEC ESOP in the amount of $455,720.78 as a

---

[33] Section 1056(d)(1) states that "a pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1).

[34] The relevant exception to § 1056(d)(1) provides, in pertinent part:

> Paragraph (1) shall not apply to any offset of a participant's benefits provided under an employee pension benefit plan against an amount that the participant is ordered or required to pay to the plan if--
>
> > (A) the order or requirement to pay arises-
> >
> > > . . .
> > >
> > > (ii) under a civil judgment (including a consent order or decree) entered by a court in an action brought in connection with a violation (or alleged violation) of part 4 of this subtitle [section 1101 et seq. of this title], or
> > > . . .
> >
> > (B) the judgment, order, decree, or settlement agreement expressly provides for the offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan, . . . .

29 U.S.C. § 1056(d)(4).

31

result of his failure to disclose the January 1999 stock purchase transaction.  This amount substantially exceeds what would have been owed to Mr. Scott by the ESOP.[35]  Therefore, the ESOP's obligation to pay funds to Mr. Scott is extinguished and the Court accordingly finds that Mr. Scott's interest in the MEC ESOP is forfeited.[36]

### b.   Injunctive Relief

Plaintiffs also request that the Court enter an injunction ordering Mr. Scott to do the following:

> i. promptly deliver to Plaintiffs May and Thompson, as directors of MEC, all books and records in Scott's possession and/or control (together with all copies or reproductions thereof) in which MEC has any interest whatsoever, regardless of the form, media, or location thereof;
>
> ii. promptly deliver to Plaintiffs May and Thompson, as directors of MEC[,] all other properties (regardless of the location thereof) in which MEC has an interest,

---

[35] The Court's conclusion is further supported by a statement of Mr. Scott's recalculated interest in the MEC ESOP for the period ending August 31, 2004.  This statement was attached to the Affidavit of Max May, in Support of Plaintiffs' Motion for Instructions, filed on August 15, 2005.  According to that statement, Mr. Scott's recalculated interest in the MEC ESOP was $376,857.42.  (Statement of Mr. Lawrence Scott's Interest in MEC ESOP, (attached to Aff. of Max May in Supp. of Mot. for Instructions, Aug. 15, 2005, Docket No. 341).)

[36] Because the Court has determined that the MEC ESOP no longer has an obligation to pay funds to Mr. Scott, it also finds that ERISA's anti-alienation provision and its corresponding exception allowing courts to offset a participant's benefits are not applicable in the instant case.

In addition, having concluded that Mr. Scott's interest in the MEC ESOP is forfeited, the Court need not evaluate Plaintiffs' request for a constructive trust.

directly or indirectly, that are in Scott's possession
and/or control, including, without limitation, all
benefits under frequent flyer or other awards programs
and the company van;

iii. promptly deliver to Plaintiffs May and Thompson,
as MEC ESOP administrative committee members, all books
and records in Scott's possession and/or control
(together with all copies or reproductions thereof) in
which MEC ESOP has any interest whatsoever regardless
of the form, media or location thereof;

iv. promptly deliver to Plaintiffs May and Thompson, as
MEC ESOP administrative committee members, all other
properties (regardless of the location thereof) in
which MEC ESOP has an interest, directly or indirectly,
that are in Scott's possession and/or control;

v. protect the confidentiality of all information
pertaining to MEC and to the MEC ESOP;

vi. refrain from disclosing, directly or indirectly, to
any person any information pertaining to MEC, including
without limitation, information relating to MEC's
prices, products, customers and suppliers; and

vii. prohibiting Scott from benefitting in any way,
financially or otherwise, from this litigation which he
necessitated, including from Plaintiffs' settlement
with NBC or from the relief awarded by the Court.

(Pls.' Post-Trial Mem., Nov. 12, 2004, (Docket No. 319), at 21-
22.)  The Court finds that Plaintiffs are entitled to the
requested injunctive relief subject to the following exceptions.
First, the Court cannot, at this time, enter an injunction
requiring Mr. Scott to protect the confidentiality of all
information pertaining to MEC and the MEC ESOP and to refrain
from disclosing information related to MEC, because there is no
claim presently before the Court based on the disclosure of

33

confidential information or trade secrets.[37]  In addition,
Plaintiffs' request for an injunction prohibiting Mr. Scott from
benefitting in any way from the instant litigation is not a
specific remedy which the Court could enforce.  Therefore,
subject to the above exceptions, the Court grants Plaintiffs'
requested injunctive relief.

### C.   Attorney's Fees

Plaintiffs contend that they are entitled to an award of
reasonable attorney's fees and expenses under either Tennessee
law and/or ERISA.  The Court will first address whether Tennessee
law provides a basis to award Plaintiffs attorney's fees and
costs before addressing whether such fees and costs can be
awarded pursuant to ERISA.

The Tennessee Court of Appeals addressed the issue of
whether a Plaintiff can recover attorney's fees based on a
court's finding of conversion in Carmical v. Kilpatrick, No.
M2002-00346-COA-R3-CV, 2002 WL 31863293 (Tenn. Ct. App. Dec. 23,
2002).  In Carmical, the Tennessee Court of Appeals specifically
noted:

> Tennessee courts have long rejected attempts to include
> attorney's fees as a part of damages, "concluding that
> an award of attorney's fees as part of the prevailing
> party's damages is contrary to public policy." John
> Kohl & Co. P.C., v. Dearborn & Ewing, 977 S.W.2d 528,
> 534 (Tenn.1998). In John Kohl & Co. the Supreme Court

---

[37] Plaintiffs are not precluded from bringing a future claim based
on any such disclosure of confidential information or trade secrets.

> stated it was not persuaded that legal malpractice claims should be made an exception to the rule against awarding attorney's fees in the absence of an agreement or statute and held that attorney's fees in legal malpractice suits, "as in other litigation," may not be awarded. *Id.* No exception has been made for attorney's fees in conversion cases, either, and we find no basis for creating one.

*Id.* Accordingly, under Tennessee law, Plaintiffs cannot recover attorney's fees based on this Court's finding of conversion.

A court may, however, in its discretion, "allow a reasonable attorney's fee and costs of action to either party" in an ERISA action brought by a participant, beneficiary, or fiduciary.  29 U.S.C. § 1132g(1).  The United States Court of Appeals for the Sixth Circuit "has rejected a presumption that attorney's fees should ordinarily be awarded to the prevailing plaintiff" in ERISA cases.  First Trust Corp. v. Bryant, 410 F.3d 842, 851 (6th Cir. 2005) (citing Foltice v. Guardsman Prods., Inc., 98 F.3d 933, 936 (6th Cir. 1996)).  The Sixth Circuit Court of Appeals has identified five factors to be considered in determining whether an award of attorney's fees is proper under ERISA:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

Id.  The above factors are not statutory and accordingly are not dispositive.  Id.  Instead, "they are simply considerations representing a flexible approach."  Id.

Applying these factors to the instant case, the Court finds that Mr. Scott engaged in culpable conduct and exhibited bad faith by his orchestration of the January 1999 stock purchase transaction, repeated conversion of MEC funds, and failure to disclose the stock purchase transaction to the MEC ESOP participants.  Because Mr. Scott testified at trial that he would be unable to satisfy a judgment of liability from the Court out of his personal assets, it is likely that he would be unable to satisfy any award of attorney's fees.  The Court finds, however, that awarding attorney's fees would have a deterrent effect on other persons contemplating a course of conduct similar to that taken by Mr. Scott in the instant case.  Moreover, in the instant case, Plaintiffs brought suit under ERISA to provide a common benefit on all participants and beneficiaries of the MEC ESOP. Finally, the Court notes that Plaintiffs' claim concerning Mr. Scott's liability for failure to disclose under ERISA was meritorious.  Accordingly, after considering the above factors in light of the proof presented during trial, as well as the entire record in this case, the Court finds that Plaintiffs are entitled to an award of attorney's fees under 29 U.S.C. § 1132(g)(1).

Plaintiffs should submit any application for attorney's fees within thirty (30) days from the date of entry of this opinion.[38]

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Mr. Scott is liable for the wrongful conversion of MEC funds and therefore enters judgment in favor of Plaintiffs in the amount of $172,203.66 on that claim. In addition, the Court finds that as a result of Mr. Scott's liability under 29 U.S.C. §§ 1024(b)(3), 1104, and 1109, Plaintiffs are entitled to restitution in the amount of $455,720.78, to be paid directly to the MEC ESOP, and therefore enters judgment in favor of Plaintiffs on those claims.[39] In addition, due to Mr. Scott's liability under 29

---

[38] Plaintiffs also requested that the Court assess $1,193.57, one-half of the transcript costs in this case, as part of the judgment against Mr. Scott. The Court notes, however, that Plaintiffs' request concerns a post-judgment issue that may be properly presented in a subsequent request for costs.

[39] Also before the Court is Mr. Scott's Objections to the Magistrate Judge's Report and Recommendation to Deny Scott's Motion to be Paid his Compensation and for an Expedited Hearing Thereon, filed on September 29, 2004. On September 20, 2004, the magistrate judge held a motion hearing and issued an oral ruling from the bench denying Mr. Scott's motion. The magistrate judge's ruling was based on the following factors: (1) Mr. Scott borrowed or took in excess of $65,000.00 for personal use; (2) Mr. Scott still owes in excess of $65,000.00; (3) Mr. Scott stated on many occasions that he intended to pay back his debt through his year-end compensation; and (4) Mr. Scott has no other means to pay this debt other than his year-end compensation.

After de novo review, the Court hereby ADOPTS the Magistrate Judge's Report and Recommendation. The Court further finds that while Mr. Scott is entitled to compensation as determined in the Report and Recommendation, that compensation is an offset to be applied against the $172,203.66 judgment entered against him in this case. It is specifically noted that the $172,203.66 judgment substantially exceeds the amount of compensation otherwise due to Mr. Scott.

U.S.C. §§ 1024(b)(3), 1104, and 1109, Plaintiffs are entitled to a forfeiture of Mr. Scott's interest in the MEC ESOP and injunctive relief. The Court therefore enters judgment in favor of Plaintiffs on those claims. Finally, the Court finds that Plaintiffs are entitled to attorney's fees pursuant to 29 U.S.C. § 1132(g)(1) and enters judgment in favor of Plaintiffs on that claim.

So ORDERED this _31_ day of August, 2005.

JON P. McCALLA
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 342 in case 2:03-CV-02112 was distributed by fax, mail, or direct printing on September 2, 2005 to the parties listed.

---

Jeremy G. Alpert
GLANKLER BROWN
One Commerce Sq.
Ste. 1700
Memphis, TN 38103

Marc Louis Schatten
GLANKLER BROWN
One Commerce Sq.
Ste. 1700
Memphis, TN 38103

Dorothy J. Pounders
POUNDERS & ASSOCIATES
1770 Kirby Pkwy
Ste. 105
Memphis, TN 38138

Larry Montgomery
GLANKLER BROWN, PLLC
One Commerce Square
Suite 1700
Memphis, TN 38103

Bobby M. Leatherman
LEATHERMAN LAW OFFICE
1661 International Place Dr.
Ste. 400
Memphis, TN 38120

Kenneth P. Jones
BOURLAND HEFLIN ALAREZ & MINOR
5400 Poplar Avenue
Ste. 100
Memphis, TN 38119

John I. Houseal
GLANKLER BROWN, PLLC
One Commerce Square
Suite 1700
Memphis, TN 38103

John J. Heflin
BOURLAND HEFLIN ALAREZ & MINOR
5400 Poplar Avenue
Ste. 100
Memphis, TN 38119

Honorable Jon McCalla
US DISTRICT COURT